567 S.E.2d 472

**The STATE, Respondent,**

v.

**Reyes CABRERA–PENA, Appellant.**

**No. 3500.**

Court of Appeals of South Carolina.

Heard April 10, 2002.
Decided May 20, 2002.
Rehearing Denied Aug. 23, 2002.

518

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General

Jeffrey A. Jacobs, all of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for respondent.

ANDERSON, J.

Reyes Cabrera–Pena ("Cabrera") was convicted of murder, possession of a firearm during the commission of violent crime, and three counts of pointing and presenting a firearm. On appeal, he argues the trial court erred in excluding a portion of a written statement he made to the police and in prohibiting him from recalling his attorney after choosing to proceed *pro se*. We affirm.

### *FACTS/PROCEDURAL BACKGROUND*

Alma Mendez was separated from her husband, Cabrera. They had a two-year-old daughter, Melissa. On the evening of June 30, 1999, Alma, Melissa, and friends Raphael Gonzalez, Jr., Vicente Cazeros, Elke Wagner, and Wagner's six-year-old son, Christopher, ate a late dinner at an Applebee's in Spartanburg County. In the middle of their dinner, Cabrera appeared in the restaurant. Cabrera approached Alma's table and spoke to her. The two were soon outside arguing. Alma later came back as Cabrera left. Alma reported to her dinner companions that Cabrera was upset about their separation and wanted her back. Alma reported that she did not want anything more to do with Cabrera.

The party left the restaurant as it began closing around midnight. As she was getting into Gonzalez's extended cab pickup, Alma spotted Cabrera's van in the parking lot of an adjacent business. Cabrera flashed his lights and Alma went over to the van. Within several minutes, she walked back to her group with Cabrera following several strides behind her. Alma motioned to the others that Cabrera had a handgun tucked under his waistband.

Cabrera announced to the group that Alma and Melissa were leaving with him. Alma said she and her daughter were not going anywhere with him. Cabrera called for Melissa, and Melissa got out of the truck and into Cabrera's arms. Gonzalez and Wagner tried to defuse the situation by telling Cabrera that since they had brought Alma and Melissa to the Applebee's, they would take her home. Cabrera instructed

Gonzalez and Wagner to stay out of his family's dispute. Alma grabbed Melissa from Cabrera. Cabrera then took the gun from his waistband and pointed it at Alma. Alma put her hand on his wrist and attempted to push the gun down. Cabrera pulled his hand back, pointed the gun at Alma, and fired. Alma, who was still holding Melissa, sustained a gunshot to her right eye and was killed. As Alma fell with Melissa to the ground, Gonzalez, Wagner, and Cazeros raced to aid the two. Cabrera pointed his gun at all three; however, he did not fire the weapon. Instead, he ran back to his van and drove away.

Spartanburg County Sheriff's Department officers arrested Cabrera within hours. He was taken to the Spartanburg County Detention Center, where investigators with the Spartanburg Department of Public Safety began an interrogation. Cabrera is a foreign-born Hispanic; thus, in an abundance of caution, the police brought in Tony Membreno, a public safety officer fluent in Spanish, to interpret for Cabrera.[1] Cabrera was read his *Miranda* rights in English by Detective Michael Morrow and Spanish by Officer Membreno. As Officer Membreno attempted to ascertain whether Cabrera understood his rights, Cabrera stated: "I'm guilty. I fully accept everything that had happened and I'm responsible for it." Cabrera then signed a waiver form, orally recounted the details of the crime, and later repeated his confession in a written statement. The oral statement was taped.

Cabrera was indicted for Alma's murder, possession of a firearm during the commission of a violent crime, and three counts of pointing and presenting a firearm. He was convicted by a jury and sentenced to life imprisonment.

## ISSUES

I.  Did the trial judge err by refusing to admit self-serving portions of Cabrera's written statement into evidence during Cabrera's cross examination of a police officer about oral statements he made to the officer during custodial interrogation?

---

1.  Cabrera was also provided a Spanish-speaking interpreter who sat beside him throughout the trial.

II. Did the trial judge err by refusing to permit Cabrera's attorney to resume his representation of Cabrera following Cabrera's decision to terminate counsel?

## LAW/ANALYSIS

### I. Admissibility of Cabrera's Self-Serving Written Statement

Cabrera argues the circuit judge erred in preventing him from introducing a self-serving portion of his written statement while cross examining Officer Membreno about oral statements he made to the officer during custodial interrogation. We disagree.

After being read his *Miranda* rights by Detective Morrow in English and by Officer Membreno in Spanish, Cabrera indicated that he understood. Cabrera gave an oral statement to Officer Membreno concerning the events surrounding the shooting and confessed to killing Alma. His statement was recorded on audiocassette and Cabrera reduced his statement to writing. In the written statement, Cabrera indicated Alma took the gun from him and the gun "went off" when he grabbed it back from her.

During the *Jackson v. Denno* hearing, the solicitor moved to have the oral statement given to Officer Membreno introduced under Rule 801(d)(2), SCRE as an admission of a party-opponent. Arguing that Cabrera's self-serving written statements were hearsay, the solicitor moved to exclude the self-serving portions of the statement from introduction through the testimony of Officer Membreno. The solicitor did not want to introduce the tape recording of the statement or the written statement. Noting that the written statement contained some self-serving statements, the court ruled that if any of the document was introduced, then the entire document, including the self-serving statements, must be introduced pursuant to the completeness theory. The solicitor informed the court that she did not plan to introduce the written statement, but she would introduce the oral statements made to the police officer through the officer's testimony.

During direct examination, Officer Membreno recounted Cabrera's oral statement in which Cabrera described the details of the evening of the shooting. On cross examination, Cabrera, proceeding *pro se*, attempted to ask Officer Membreno about the written statement and wanted him to read it. The court asked the parties to approach the bench. The following discussion occurred out of the hearing of the jury:

Solicitor: And he wants [Officer Membreno] to read parts of it?

Before the officer reads, you know, I think that he is going to have to offer this into evidence. Certainly at that point I would renew my objection to introduction of this officer of any statements. Basically I think—

The Court: The State has objected to any statement that was made by you that tends to be in your favor. You may remain silent or you may tell the jury about this, but you may not ask this witness about this statement, this part of it.

Cabrera: Why can't I?

The Court: You either have to testify or remain silent. If you are permitted to ask him to read this part of the statement, then you are testifying through another witness, which is not permitted. Do you understand?

Cabrera: It's the same thing that I said that I signed. It's the same thing.

The Court: You may testify or you may remain silent, but you may not ask this witness what you said to defend yourself.

The judge then excused the jury and read the portion of the written statement Cabrera wished to discuss into the record: "I don't know how she took the gun out of my pants pocket. I tried to grab and force her, but the gun went off and fired." The court found the statement was self-serving and not a proper question to ask on cross examination.

The trial continued. During deliberations, the jury requested and received the manslaughter and murder instructions. Three hours later, the jury indicated it had reached a verdict on the firearms offense, but not on the murder or manslaughter offense. The judge gave the jury an *Allen* charge. An hour later, the jury again requested an instruction on the

distinction between murder and manslaughter, and the judge charged the jury on both offenses. Nearly two hours later, the jury returned a verdict of guilty of murder.

Cabrera argues that excluding the portion of his written statement about the gun going off during a struggle with Alma was unfair.

## A. Rule 106, SCRE Analysis

Rule 106, SCRE, provides:

When a *writing, or recorded statement,* or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

(emphasis added).

■■ "In interpreting the language of a court rule, we apply the same rules of construction used in interpreting statutes. Therefore, the words of [the rule] must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the rule." *State v. Brown,* 344 S.C. 302, 306, 543 S.E.2d 568, 570 (Ct.App.2001) (quoting *Green v. Lewis Truck Lines, Inc.,* 314 S.C. 303, 304, 443 S.E.2d 906, 907 (1994)).

In construing the parameters of Rule 106, SCRE, our Supreme Court has looked to Rule 106 of the Federal Rules of Evidence. The common-law doctrine of completeness has been partially codified in Rule 106 of the Federal Rules of Evidence. *United States v. Wilkerson,* 84 F.3d 692, 696 (4th Cir.1996) (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 171–72, 109 S.Ct. 439, 450–51, 102 L.Ed.2d 445 (1988)). *The rule applies only to writings or recorded statements, not to conversations. Id.* (citing Fed.R.Evid. 106, advisory committee notes and *United States v. Bigelow,* 914 F.2d 966 (7th Cir.1990), *cert. denied,* 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991)) (emphasis added). In *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998), the Court noted Rule 106, Fed.R.Evid. is based on the "rule of completeness" and "seeks to avoid the unfairness inherent in 'the misleading impression created by taking matters out of context.'" *Id.* at 170, 508 S.E.2d at 875 (citations omitted). Additionally,

Rule 106 [of the Federal Rules of Evidence] is a procedural device governing the timing of completion evidence; the Rule is 'primarily designed to affect the order of proof.' It means that the adverse party need not wait until cross-examination or rebuttal. As such, the Rule reduces the risk that a writing or recording will be taken out of context and that an initial misleading impression will take hold in the mind of the jury.

*Id.* (citations omitted).

■ Although Rule 106 is intended to clarify any misconceptions the admission of a partial statement would give, "[o]nly that portion of the remainder of a statement which explains or clarifies the previously admitted portion should be introduced." *Id.* at 171, 508 S.E.2d at 876 (citations omitted).

The actual recording of Cabrera's oral statement was not admitted into evidence. Membreno did not mention in his testimony whether Cabrera's oral statement contained the same self-serving statement as the written statement regarding the struggle over the gun. The record before us only indicates that Cabrera made the self-serving statement in the *written* statement. As Rule 106 only applies to writings or recordings, we find no error with the trial court's refusal to admit any self-serving portion of the oral conversation Cabrera had with Membreno under a Rule 106 analysis.

Further, Cabrera only attempted to admit a portion of the *written* statement, not any portion of the *oral* statement. Because the written statement was never introduced, the trial judge did not violate Rule 106 in prohibiting Cabrera from questioning Membreno regarding the self-serving portions of the written statement. Rule 106, by its terms, refers only to *written* or *recorded* statements, not to conversations.

### B. *State v. Jackson* Analysis

Before the South Carolina Rules of Evidence were adopted, *State v. Jackson*, 265 S.C. 278, 217 S.E.2d 794 (1975), held that when some of a conversation is placed into evidence, a party is entitled to "prove the remainder of the conversation, so long as it is relevant, particularly when it explains or gives new meaning to the part initially recited." *Id.* at 284, 217 S.E.2d

at 797. Because the oral statement was introduced in totality, the trial court complied with the rule in *Jackson*.

### C. *State v. Terry* Analysis

In *State v. Terry*, 339 S.C. 352, 529 S.E.2d 274, *cert. denied*, 531 U.S. 882, 121 S.Ct. 197, 148 L.Ed.2d 137 (2000), the Supreme Court held that a defendant who elected not to testify in accordance with his Fifth Amendment privilege against self-incrimination was not "unavailable" within the meaning of Rule 804(b)(3), SCRE. As a result, the defendant could not introduce his confession, which suggested he was guilty of manslaughter rather than murder, as a statement against penal interest. The Court reasoned that the defendant was attempting to exculpate himself with his confession and held that a defendant seeking to make exculpatory statements must face cross examination unless corroborating circumstances clearly indicated the trustworthiness of the statements. *Id.* at 356–57, 529 S.E.2d at 276–77.

In *State v. Golson*, 349 S.C. 421, 562 S.E.2d 663 (App.2002), the Court of Appeals analyzed the admissibility of the defendant's exculpatory statement under the *Terry* analysis. Unlike the scenario in *Terry*, Golson testified in his own defense. Accordingly, Golson did not render himself unavailable as a witness by virtue of the exercise of his Fifth Amendment privilege against self-incrimination. Moreover, the prosecution was afforded the opportunity to—and did—cross examine Golson. Taking these circumstances into account, this Court found the holding in *Terry* did not control the evidentiary issue in this case. *Id.* at 428–29, 562 S.E.2d 663.

Cabrera did not testify. His reliance upon *Golson* is misplaced because Golson testified in his own defense and was subjected to cross examination. Cabrera falls squarely into the holding of *State v. Terry*.

### II. Trial Judge's Refusal to Permit Cabrera to Recall His Attorney to Resume Once Counsel was Dismissed

Cabrera argues the trial judge erred in ruling that he could not change his mind about proceeding *pro se* once he decided to dismiss his attorney. We disagree.

During pre-trial proceedings, Cabrera passed a letter to the trial judge in which he announced his desire to terminate representation by his attorney, Michael Morin. In the letter, Cabrera complained Morin failed to review evidence in the case with him, failed to pursue plea alternatives, and was not prepared for trial. He requested the appointment of another public defender and a continuance. Cabrera's letter was read into the record. Morin disputed Cabrera's claims regarding his preparation and the pursuit of a plea, but added he likely could not represent Cabrera because an adversarial atmosphere between the two had apparently arisen. Morin stated:

Morin: I feel that I am prepared to try this case. However, I must also say that having had read this into the record, it may appear that an adversarial situation has developed between my client and myself. And I think it's important for me to put that to the court, having—I don't want to go into all the things that I would deny in that record, but there is obviously ethical violations that have been accused of me, as well as any honesty I would have with my client. And while I am prepared to go forward, I think— I hate to say this, but that may create an adversarial position between my client and myself.

The Court: Thank you[,] Mr. Morin. Ms. Stone, any response or remarks?

In her response, the solicitor strenuously argued against a continuance due to a lack of due diligence by Cabrera to inform the court of his concerns and the cost to the State if the trial was delayed. At the time these proceedings occurred, the matter had been pending for *nine months:*

Solicitor: Of course, it's never been brought to our attention before this morning that the defendant wished to fire Mr. Morin. It's my understanding from him that he didn't even realize that when we had the hearing earlier. Mr. Morin represented him at a criminal domestic violence trial a month ago, when I know for certain we discussed this date at that time. He represented him at that trial. He had no problem with him at that point.

He has been in jail for approximately nine months. As he stated, he doesn't have any money to hire a private

attorney. And he hasn't attempted to do that prior to this time.

While he's complaining about us pushing this case. Of course, we have to consider things like defendants in jail. He has been denied bond. And, of course, the seriousness of the charge, including the feelings of the family that would like to put this to rest in their minds and hearts concerning the death of their sister and the assertion of what happens to the children, yes, we have tried to move this case. We have let the defense know that we had it set on a trial. And as far as I know, he's told his client.

The judge denied Cabrera's motion for a continuance. He then informed Cabrera of his options regarding representation and provided him with time to carefully consider his decision:

The Court: With regard to the motion of Mr. Cabrera to discharge the services of his attorney. He has that right. He may do that, but he will be representing himself, which is not advised and which is an unwise ... and an unhappy thing to do, because is not learned in the law or the procedures of the court, and lawyers are supposed to speak for their clients.

If you were to discharge Mr. Morin, you would be speaking for yourself, with no knowledge of the law or the procedures involved. So, it's your decision whether you want to have Mr. Morin assist you and try this case, or whether you wish to try the case and represent yourself.

Take your time. Take your time.

Cabrera: Yes, sir.

The Court: Take your time and talk with Mr. Morin about this. There is no—there is no rush. Take your time and make a decision as to whether you want Mr. Morin to represent you or whether you wish to represent yourself.

Following a recess, the court asked Cabrera for his decision:

The Court: Now, Mr. Cabrera, you have a right to remain silent. You do not have to speak at all during the trial.

You have a right to confront the witnesses who may be called to testify against you. If you wish to ask them any questions, you may ask them questions yourself.

The court will instruct the jury that they cannot hold against you the fact that you do not testify in your own behalf. The jurors would be instructed that they couldn't talk about your maintaining your silence, even when they considered your guilt or innocence in the jury room.

The court has denied your motion for continuance.

The case will go forward, as the State has prepared its case and is ready to go forward.

You may have Mr. Morin represent you; you may represent yourself; you may have Mr. Morin sit with you and assist you; or you may remain silent throughout the trial; or you may, through [the interpreter], ask questions of the State's witnesses on your own and represent yourself.

Do you understand your options?

Cabrera: Yes.

The Court: The court warns you in the strongest possible measure that you should have an attorney to represent you in this matter. However, you are entitled to represent yourself, if you choose to do so. Do you understand?

Cabrera: Yes.

Following the instructions from the court, the trial was recessed to give Cabrera the opportunity to further discuss his representation with his attorney.

The Court: Mr. Morin, have you talked with your client about his desire to have your representation, or otherwise?

Morin: Yes, sir.

The Court: What is his decision?

Morin: I do not know. He will have to—

The Court: The court will speak directly to Mr. Cabrera. Mr. Cabrera, do you wish to have Mr. Morin represent you?

. . . .

Cabrera: If I don't have any other opportunity or possibility, yes.

The Court: Very well. Mr. Morin, you will continue in your representation. You will have access to Mr. Cabrera.

And if Mr. Morton is available, to have him assist you further in more detail preparations.

Proceedings for the day were soon adjourned. The next morning, Morin reported to the court that Cabrera had changed his mind regarding Morin's continued representation of him. The court again stressed to Cabrera that representation by an attorney in a criminal matter was critical and that the judge was not in a position to assist him with his defense if he terminated Morin. The judge further emphasized that the trial would go forward regardless of whether Cabrera was represented:

The Court: Mr. Cabrera, you have the right to represent yourself. It is extremely unwise for a person to represent himself or herself in this court. There are dangers and there are pitfalls in your attempting to represent yourself. The court under no circumstance is permitted to assist you in your defense. That is to say, that if you are unaware of the procedural requirements of the presentation of your case, you may not know what to do, and no one will be able to advise you as to what the procedural requirements are. Therefore, the court in the strongest possible terms again advises you against representation of yourself.

However, you do have that right. It is an absolute right. You may represent yourself, if you please. You may ask questions of the witnesses called by the State.

You may assert your absolute right to silence and not testify in your own defense. If you choose to testify, you may do so. If you choose not to testify, the court will instruct the jury that you will have invoked that right and the jury may, under no circumstances, hold that against you. They could not even discuss your right to silence and the fact that you did not testify in your own behalf while they were considering your guilt or innocence.

The caution of the court goes to your lack of knowledge of the procedural requirements of a trial, particularly your probable lack of knowledge of the law and the procedures of the trial.

So again, the Court advises you strongly and seriously to reconsider your position.

What is your desire?

Cabrera: I can't represent my own person. I don't know the laws and the rights. And I'm not able to permit that [Morin] represent me, because I'm not content with his work.

Your Honor, you know the law and you know whether the case will continue or not—will go forward or not.

The Court: The case will go forward, whether you represent yourself or whether Mr. Morin represents you.

Cabrera: Neither of the two.

The Court: Mr. Morin will sit with you at the request of the court and answer any questions that you have. You may represent yourself.

This court again will not, may not, and cannot under any circumstances advise you of your rights at any time during these proceedings. Do you understand?

Cabrera: I just—I don't want a trial. I don't want anything.

Notwithstanding Cabrera's decision, the trial judge directed Morin to remain with Cabrera throughout the trial to answer any questions by Cabrera:

The Court: [Cabrera] has elected to relieve you as his lawyer. After the trial commences, he will not be able to change his mind.

One of the basic and most important reasons for an attorney, as was told to you on yesterday . . . is to speak for you . . . . . It is important that you not speak for yourself, unless you desire to do that. So you may not, after the commencement of the trial, which is about to start, change your mind and have Mr. Morin brought back into the case. This is an extremely important decision for you.

Cabrera continued to refuse Morin as an attorney during the trial, but he argued that he was "not participating" in his trial and that he did not know how to represent himself.

Cabrera argues the trial judge erred in ruling he could not change his mind and request counsel during the trial.

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). This right may be waived. *State v. Fuller*, 337 S.C. 236, 523 S.E.2d 168 (1999). "While it is beyond question that an accused may waive counsel and represent himself, it is the responsibility of the trial judge to determine whether there has been an intelligent and competent waiver." *State v. Bateman*, 296 S.C. 367, 369, 373 S.E.2d 470, 471 (1988) (citations omitted). Waiver may be accomplished by making an intentional and voluntary relinquishment of this right. *Id.* A trial court, however, must determine the waiver is the product of a knowing, voluntary, and intelligent decision. *State v. Boykin*, 324 S.C. 552, 478 S.E.2d 689 (Ct.App.1996).

Further, the defendant must be informed on the record of the dangers and disadvantages of self-representation or the record must indicate the defendant had sufficient background to understand the disadvantages of self-representation before he waives his right to counsel. *Id.* "While a specific inquiry by the trial judge expressly addressing the disadvantages of a *pro se* defense is preferred, the ultimate test is not the trial judge's advice but rather the defendant's understanding." *Wroten v. State*, 301 S.C. 293, 294, 391 S.E.2d 575, 576 (1990). Where the trial judge fails to make a specific inquiry informing the defendant of the perils of proceeding *pro se*, "this Court will look to the record to determine whether [the defendant] had sufficient background or was apprised of his rights by some other source." *Prince v. State*, 301 S.C. 422, 424, 392 S.E.2d 462, 463 (1990).

There is no right to hybrid representation in South Carolina. *State v. Stuckey*, 333 S.C. 56, 508 S.E.2d 564 (1998); *Foster v. State*, 298 S.C. 306, 379 S.E.2d 907 (1989); *State v. Sanders*, 269 S.C. 215, 237 S.E.2d 53 (1977). "Hybrid representation" is representation which is "partially *pro se* and partially by counsel." *State v. Reed*, 332 S.C. 35, 43, 503 S.E.2d 747, 751 (1998). The right to counsel, once waived, is no longer absolute. *Id.* at 44, 503 S.E.2d at 751. There is a presumption that a defendant's ***post-trial*** request for the

assistance of counsel should not be refused. *Id.* However, "there are times when the criminal justice system would be poorly served by allowing the defendant to reverse his waiver at the last minute particularly where delay would result." *Id.*

In *Reed,* a defendant elected to proceed *pro se* in his capital murder trial and was found guilty. On the evening before the sentencing phase, the defendant asked that standby counsel be appointed as counsel. The trial judge denied the request. Noting that the defendant's request occurred during a continuing, and not separate, proceeding and that counsel was not prepared, the Supreme Court found the trial judge did not abuse his discretion in denying the defendant's request for reappointment of counsel. *Id.* at 44, 503 S.E.2d at 751.

In the instant case, the trial judge—through a skilled interpreter—repeatedly explained to Cabrera: (1) that the trial would go on despite his protestations; (2) that he had the right to represent himself or have Morin continue with his representation; (3) that self-representation was an unwise and disadvantageous route to take; and (4) once Cabrera came to a decision regarding his representation, there would be no chance to have Morin resume his representation later in the proceedings. On each of these occasions, the court asked Cabrera if he understood what the court was saying. Every time when asked, Cabrera responded in the affirmative. Clearly, Cabrera made a knowing and intelligent waiver of counsel.

The timing of Cabrera's letter complaining about Morin's representation is evidence of his desire not to go to trial. The trial judge elected not to indulge Cabrera's attempt to delay the proceedings. This was within the judge's discretion. *See State v. Marshall,* 260 S.C. 323, 195 S.E.2d 709 (1973) (affirming trial judge's denial of a motion for continuance because the defendant had not exercised due diligence in securing the presence of a witness for trial).

Allowing Cabrera to recall his attorney during the trial, after he had specifically waived his right to counsel, would have impermissibly resulted in hybrid representation. As the right to counsel is not absolute once waived, the trial court was acting within its discretion in prohibiting hybrid representation. Thus, the trial court could not permit Morin to resume his representation of Cabrera later in the trial.

Further, unlike the defendant in *Reed*, Cabrera did not specifically ask for the re-appointment of counsel. Cabrera's protestations throughout the trial that he was not participating and that he did not know how to represent himself amounted to expressions of dissatisfaction with the legal system, not a request to withdraw his waiver of counsel. *See State v. Hyatt*, 132 N.C.App. 697, 513 S.E.2d 90, 94 (1999) ("[T]o obtain relief from a waiver of his right to counsel, a criminal defendant must move the court for withdrawal of the waiver"). The trial court committed no error in its ruling that Cabrera could not "change his mind" regarding Morin's representation after electing to terminate counsel.

## CONCLUSION

We rule that Rule 106, by its terms, refers only to *written* or *recorded* statements, not to *conversations*. Further, the efficacy of Rule 106 is to prevent a party from misleading the jury by allowing into evidence relevant portions of the excluded statement which clarify or explain the portion already received. Here, Cabrera *only* attempted to admit part of the *written* statement, not any portions of the *oral* statement.

The Sixth and Fourteenth Amendments of our Constitution guarantee that a defendant in any state or federal court must be afforded the right to assistance of counsel before the defendant can be validly convicted and punished. Indubitably, this right may be waived; however, the trial judge has the duty to determine whether there has been an intelligent and competent waiver. Waiver is the intentional and voluntary relinquishment of this right. The waiver must be the product of a knowing, voluntary, and intelligent decision. A defendant must be informed on the record of the dangers and disadvantages of self-representation or the record must indicate the defendant had sufficient background to understand the disadvantages of self-representation before the defendant waives the right to counsel.

This record is a paradigm of trial court inquiry as to all facets of constitutional rights and waiver. Based on the foregoing, Cabrera's conviction is

**AFFIRMED.**

CURETON, J., and THOMAS, Acting Judge, concur.